UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARVANA, LLC,<br><br>                              Plaintiff,<br><br>        v.<br><br> INTERNATIONAL BUSINESS MACHINES<br> CORPORATION,<br><br>                              Defendant. | No. 23-CV-8616 (KMK)<br><br> <u>OPINION & ORDER</u> |

<u>Appearances:</u>

Andrew Hensley, Esq.
Brian W. LaCorte, Esq.
Mitchell Lee Turbenson, Esq.
Ballard Spahr LLP
Phoenix, AZ
*Counsel for Plaintiff*

Doyle Tuvesson, Esq.
Marc Segal, Esq.
Ballard Spahr LLP
Philadelphia, PA
*Counsel for Plaintiff*

Jeffrey C. Morgan, Esq.
Ballard Spahr LLP
Atlanta, GA
*Counsel for Plaintiff*

Padmaja Chinta, Esq.
Dunnington Bartholow & Miller LLP
New York, NY
*Counsel for Plaintiff*

Samuel J. Erlanger, Esq.
Wendy R. Stein, Esq.
Ballard Spahr LLP
New York, NY
*Counsel for Plaintiff*

Karim Zeddam Oussayef, Esq.
Tamir Packin, Esq.
Asim Zaidi, Esq.
Jordan Nathaniel Malz, Esq.
Lindsey Miller, Esq.
Michael Hilyard, Esq.
William N. Yau, Esq.
Desmarais LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiff Carvana, LLC ("Plaintiff" or "Carvana") brings this Action seeking a declaration of non-infringement regarding two patents owned by Defendant International Business Machines Corporation ("IBM" or "Defendant"): U.S. Patent Nos. 7,543,234 (the "'234 Patent") and 7,631,346 (the "'346 Patent").[1]  (*See* Compl. (Dkt. No. 1).)  Defendant, in turn, brings counterclaims for infringement of U.S. Patent No. 7,702,719 (the "'719 Patent"), the '234 Patent and the '346 Patent.  (*See* Am. Answer (Dkt. No. 63).).

The Parties have proposed their own construction of the disputed claims in the '234, '346, and '719 Patents pursuant to *Markman v. Westview Instruments, Inc*., 517 U.S. 370 (1996). The Court addresses the disputed terms below.

## I.    Background

### A.  Factual Background

#### 1.  The '234 Patent

The '234 Patent is titled: "Stacking Portlets in Portal Pages."  (Carvana Claim Construction Stmt. ("Carvana Br.") Ex. 8 ("'234 Patent") 2 (Dkt. No. 122-9).)  The '234 Patent

---

[1] Carvana originally sought declaratory judgment of its non-infringement of U.S. Patent No. 7,072,849, (*see* Compl.), but has since voluntarily dismissed that claim, (*see* Dkt. No. 54).

"relates generally to graphical user interface," and in particular "an improved method, apparatus, and computer usable code for customizing portal pages." (*Id*. col. 1 l. 6–9.) The invention provides for a "portal" which is "comprised of a plurality of portlets." (*Id*. col. 1 l. 42–43.) "Portlets," in turn, "access[] hardware and software to gather data." (*Id*. col. 1 l. 44–45.) "Portlets" can be stacked into a portal if they share "one or more of the same hardware, software, content type, or markup." (*Id*. col. 1 l. 46–48.) "If the subset of portlets is stackable" and a user decides to stack them, then the portlets are "stacked such that the stack of portlets presents a first portlet and a control for selecting a second portlet from within the subset of portlets that is not currently presented." (*Id*. col. 1 l. 51–55.)

2. The '346 Patent

The '346 Patent is titled: "Method and System for a Runtime User Account Creation Operation Within a Single-Sign-On Process in a Federated Computing Environment." (Carvana Br. Ex. 1 ("'346 Patent") 2 (Dkt. No. 122-2).) It purports to provide a "method, system, apparatus, and computer program product" that "support[s] computing systems of different enterprises that interact within a federated computing environment." ('346 Patent 2.) "According to the '346 patent, when a user navigates domains within the Internet by accessing resources at the different domains, the user may be subjected to multiple user authentication requests, which can slow the user's navigation." *Ebates Performance Mktg., Inc. v. Int'l Bus. Mach. Corp.*, No. IPR2022-00646, 2023 WL 7358027, at *2 (P.T.A.B. Oct. 11, 2023). "The '346 patent describes a federated computing environment in which entities may provide a user with a single-sign-on (SSO) experience, doing away with the frustration of having to authenticate to multiple domains for a single transaction." *Id*.

####    3.    The '719 Patent

The '719 Patent is titled: "Methods and Apparatus for Reducing the Number of Server Interactions in Network-Based Applications using a Dual MVC Approach."  (Carvana Br. Ex. 5 ("'719 Patent") 2 (Dkt. No. 122-6).)  The '719 Patent's invention is a dual-Model-View-Controller ("MVC") model.  (*See id*.)  "In [the MVC] paradigm, the 'Model' contains the data, rules, and algorithms affecting the data.  The 'View' is a screen or window representation of a subset of the model that the application chooses to display.  The 'Controller' is the logic that processes user requests, such as pressing a button.  The Controller causes the Model to be changed and/or the View to be refreshed."  (*Id*. col. 1 l. 41-46.)  The '719 Patent's central innovation is its "dual-MVC approach, in which a subset of the application's Model-View-Controller reside on the client, and the full Model-View-Controller and View-Generating-Logic reside on the server, thereby reducing the number of required server interactions."  (*Id*. col. 2 l. 42–47.)

###    B.    Procedural Background

On September 29, 2023, Carvana brought this action against IBM, seeking declaratory relief under 28 U.S.C. §§ 2201–2202 of its non-infringement of three of IBM's patents.  (*See* Compl. (Dkt. No. 1).)  IBM filed its answer along with counterclaims for infringement on December 4, 2023.  (*See* Answer (Dkt. No. 36).)  Carvana originally sought declaratory judgment of its non-infringement of U.S. Patent No. 7,072,849, (*see* Compl. (Dkt. No. 1)), but has since voluntarily dismissed that claim, (*see* Dkt. No. 55).  Thus, the patents that Carvana seeks a declaration of non-infringement for are the '234 Patent and '346 Patent.  On April 2, 2024, IBM amended its complaint to add a patent infringement claim against Carvana for its

alleged infringement of the '719 Patent.  (*See* Am. Answer (Dkt. No. 63).)  Thus, the remaining

patents at issue in this action are the '234, '346, and '719 Patent.

The Court held an initial conference on December 25, 2023, (*see* Dkt. No. 37), and set a

case management plan, (*see* Dkt. No. 39).  Pursuant to a briefing schedule set by the Court, (see

Dkt. No. 82), the Parties briefed claim construction statements, (*see* Not. of Joint Claim

Construction Stmt., Ex. A ("Joint Stmt.") (Dkt. No. 105-1); IBM Claim Construction Br. ("IBM

Br.") (Dkt. No. 110); Carvana Claim Construction Br. ("Carvana Br.") (Dkt. No. 122); IBM Rep.

Claim Construction Br. ("IBM Rep. Br.") (Dkt. No. 132); Carvana Sur-Reply Claim

Construction Stmt. ("Carvana Rep. Br.") (Dkt. No. 133)), and the Court held a *Markman* hearing

on November 20, 2024, (*see* Jul. 16, 2024 Dkt. Entry.)

On January 31, 2025, Carvana sought inter partes review ("IPR") of the '719 Patent with

the U.S. Patent and Trademark Office's (the "PTO") Patent Trial and Appeal Board (the

"PTAB").  (*See* Dkt. No. 141.)  Carvana then sought a stay in light of the pending IPR and in

light of an ongoing appeal of the '346 Patent before the Federal Circuit.  (*See id.*)  The Court

provided the Parties an opportunity to brief the issue.  (*See* Dkt. Nos. 147, 148, 150, 151, 152.)

On July 18, 2025, the Parties informed the Court that Carvana's IPR petition had been denied by

the PTAB.  (*See* Dkt. No. 154.)  On August 5, 2025, Carvana notified the Court that the appeal

of the '346 Patent was scheduled for September 2025.  (*See* Dkt. No. 155.)  On September 3,

2025, the Court granted Carvana's Motion to Stay pending a determination by the Federal

Circuit of the validity of the '346 Patent.  (*See* Dkt. No. 156.)  The Federal Circuit then ruled in

*Int'l Bus'n Mach. Corp. v. Zillow Grp., Inc. et al.*, 160 F.4th 1360, 1362 (Fed. Cir. 2025), that

claims 1–4, 12–16, and 18–19 in the '346 patent were unpatentable, but claims 5–11, 17, and 20

in the '346 patent were not unpatentable.  The Parties submitted a joint update on December 19,

2025, agreeing that the Federal Circuit's decision took four of IBM's claims relevant to this Action—claims 1, 12, 13, and 14—off the table here.[2] (*See* Joint Status Rep. re: Fed. Cir. Decision 1–2 (Dkt. No. 157) ("IBM . . . will not assert the claims that were found unpatentable and has already informed Carvana that it can consider those claims removed from IBM's infringement contentions.").)

## II.    Discussion

### A.  Standard of Review

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Shunock v. Apple, Inc.*, No. 23-CV-8598, 2025 WL 33431, at *2 (S.D.N.Y. Jan. 6, 2025) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc)). "When parties dispute the scope of a patent claim, the court partakes in claim construction, an exercise that 'falls exclusively within the province of the court, not that of the jury.'" *Id*. (quoting *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015)). "The task of claim construction requires [a court] to examine all the relevant sources of meaning in the patent record with great care, the better to guarantee that [the court] determine[s] the claim's true meaning." *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020) (quoting *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996)).

---

[2] However, because claims 5–11 are dependent claims drawing on claim 1, and the Federal Circuit held these claims *were* patentable, the Court will and must still consider the construction of claim 1 where relevant. *See generally Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1356 (Fed. Cir. 2001) ("Because dependent claims contain additional limitations, they cannot be presumed to be invalid . . . just because the independent claims from which they depend have properly been so found.").

As for the process of claim construction, courts look to two forms of evidence: intrinsic evidence and extrinsic evidence. "[C]ourts look 'first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history.'" *Trove Brands LLC v. Jia Wei Lifestyle Inc.*, No. 24-CV-3050, 2025 WL 1409558, at *2 (S.D.N.Y. May 15, 2025) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Nanobebe US Inc. v. Mayborn (UK) Ltd.*, No. 21-CV-08444, 2023 WL 2986936, at *2 (S.D.N.Y. Apr. 18, 2023) ("[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.").

The specification of a patent "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Nanobebe US Inc.*, 2023 WL 2986936, at *2 (quoting *Phillips*, 415 F.3d at 1315). Nevertheless, "the claims, not the specifications, define the scope of the invention such that a court should not read limitations from the specification into the claim." *Id*. (quoting *Phillips*, 415 F.3d at 1323).

"Where an analysis of the intrinsic evidence fails to resolve some ambiguity in a disputed claim, the Court may then turn to extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *See Trove Brands LLC*, 2025 WL 1409558, at *2 (citing *Vitronics*, 90 F.3d at 1583, and *Markman*, 52 F.3d at 980). "However, extrinsic evidence 'is generally of less significance than the intrinsic record' and 'may not be used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" *Nanobebe US Inc.*, 2023 WL 2986936, at *2 (quoting *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1380 (Fed. Cir. 2016)

In general, the Court must abide by "the principle that the words of a claim are generally given their ordinary and customary meaning," *Edge Sys. LLC v. Cartessa Aesthetics, LLC*, 571 F.

Supp. 3d 13, 17 (E.D.N.Y. 2021) (internal citations omitted), "as understood by a person of ordinary skill in the art in question at the time of the invention (a 'POSITA')," *Trove Brands LLC*, 2025 WL 1409558, at \*2. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Nanobebe US Inc.*, 2023 WL 2986936, at \*2 (citing *Phillips*, 415 F.3d at 1314).

"There are two exceptions to the rule that claim terms are construed according to their plain and ordinary meaning: first, where a patentee sets out a definition and acts as his own lexicographer, and second, where a patentee disavows the full scope of the claim term either in the specification or during prosecution." *Trove Brands LLC*, 2025 WL 1409558, at \*2 (quoting *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (internal quotation marks omitted)). "The standards for finding lexicography and disavowal are 'exacting.'" *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (quoting *GE Lighting Solutions, LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014)).

B. Disputed Terms [3]

1. The '234 Patent

a. "Portlet"

| Carvana's Proposed Construction | IBM's Proposed Construction |
|---|---|
| "a display element *that accesses and monitors specific software processes or hardware resources* to gather information" | "display of gathered information" |

---

[3] Prior to the *Markman* hearing, the Parties came to an agreement regarding the construction of the preamble of the '719 Patent and the term "stackable" in the '234 Patent. (*See* Dkt. No. 135.) The Court therefore does not address the construction of those terms here.

The Parties dispute the meaning of the term "portlet," which appears in claims 7, 9–11 of the '234 Patent.  (*See* Joint Stmt. 4.)  The Parties do not dispute that a "portlet" refers to a "display of gathered information."  (*See* IBM Br. 27; Carvana Br. 32.)  However, Carvana argues that a "portlet" also "accesses and monitors specific software processes or hardware resources." (Carvana Br. 32.)  IBM argues this construction "improperly reads limitations into the claim term and improperly excludes exemplary embodiments."  (IBM Br. 27.)  Carvana responds that its construction is supported by both the language in the specification and the embodiments.  (*See* Carvana Br. 32.)

As to the question of whether a "portlet" only must be tied to a hardware resource or software process, the Court concludes that IBM's less restrictive interpretation is most aligned with the principles of claim construction.  It is no doubt true that the '234 Patent's specification often ties "portlets" to "hardware resources" or "software processes."  (*See* '234 Patent, Abstract ("Each portlet accesses hardware and software to gather data."); *id.* col. 1 l. 44–45 ("Each portlet accesses hardware and software to gather data."); *id.* col. 2 l. 64–65 ("The portlet accesses specific software processes or hardware to gather information").)  These ties are also evidenced in the claims, which refer to the "software processes and hardware resources *each portlet accesses*."  (*Id*. col. 8 l. 30–31.)

Nonetheless, the specification clearly anticipates a more expansive set of sources.  In discussing Figure 3, the specification states that the figure "designates a block diagram showing portlets monitoring one or more resources."  ('234 Patent, col. 4 l. 33–34.)  It specifies that a "resource" includes a "software process, a hardware subsystem, *or a similar network resource*." (*Id.* (emphasis added).)  The addition of the latter clause appears to contemplate a non-hardware and non-software resource that the portlet can monitor.  A definition of "portlet" that limits its

9

sources to hardware and software would eliminate this portion of the specification from the patent and would therefore be in tension with longstanding principles of claim construction. *See FloodBreak, LLC v. Art Metal Indus., LLC*, No. 18-CV-503, 2020 WL 4548084, at *9 (D. Conn. Aug. 6, 2020) (declining to impose the more restrictive construction onto a disputed claim because "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct" (quoting *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)).

Nor is *Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009), to the contrary. (*See* Carvana Br. 33 (arguing that *Abbott Laboratories* permits the Court to adopt its preferred construction).) In *Abbott Laboratories*, the Federal Circuit upheld a District Court's limiting construction where that construction aligned with the *only* embodiment described in the specification *and* where the prosecution history suggested that the plaintiff intended to disclaim a broader construction. *See Abbott Lab'ys*, 566 F.3d at 1290. The facts in *Abbott Laboratories* are distinct from those here, where embodiments in the specification would have to be excluded in order to adopt Carvana's construction. Moreover, the Court's review of the intrinsic record reveals no additional evidence to support Carvana's construction. Thus, the Court adopts IBM's construction of the claims.

Similarly, Carvana's construction requiring that each portlet both "access *and* monitor" its resources would impose an additional limitation upon the claim term without justification. As IBM rightly points out, the specification includes embodiments where portlets *only* access resources, rather than access and monitor resources. (*See* '234 Patent col. 2 l. 63–64 ("The portlet *accesses* specific software processes or hardware to gather information" (emphasis added)); *id*. col. 5 l. 4–5 ("For example, portlet 302 and portlet 308 both *access* resources 310,

10

312, and 316 . . ." (emphasis added)); *see also id.* col. 1 l. 44–45 ("Each portlet *accesses* hardware and software to gather data . . . (emphasis added)).) As noted previously, "a court should reject a proposed construction that would improperly read one of the embodiments described in the specification out of the patent." *Shaf Int'l, Inc. v. First Mfg. Co. Inc.*, No. 20-CV-1242, 2022 WL 2791999, at *4 (E.D.N.Y. July 15, 2022) (quoting *Knowles Elecs. LLC v. Iancu*, 886 F.3d 1369, 1375 (Fed. Cir. 2018) (alterations adopted) (internal quotation marks omitted)). Therefore, the Court rejects Carvana's construction as in tension with the principles of claim construction. *See Tools Aviation, LLC v. Digital Pavilion Elecs. LLC*, No. 20-CV-2651, 2021 WL 5920142, at *10 (E.D.N.Y. Dec. 15, 2021) (rejecting the defendant's proposed construction where it would exclude an embodiment from the specification); *Uni-Sys., LLC v. United States Tennis Ass'n Nat'l Tennis Ctr. Inc.*, No. 17-CV-147, 2020 WL 3960841 (E.D.N.Y. July 13, 2020) (rejecting a proposed construction where the construction would exclude a preferred embodiment).

For the foregoing reasons, the Court adopts IBM's construction of "portlet."

b.  "Portal Page Generator" and "Portlet Generator"

| Term | Carvana's Proposed Construction | IBM's Proposed Construction |
|---|---|---|
| Portal Page Generator | "a server application that dynamically generates a portal page comprised of portlets" | no construction necessary/plain and ordinary meaning |
| Portlet Generator | "a server application that dynamically generates a portlet" | no construction necessary/plain and ordinary meaning (in view of the proposed construction of "portlet") |

The Parties dispute the meaning of the terms "portal page generator" and "portlet generator," which appear in claims 7 and 9–11 of the '234 Patent. (*See* Joint Stmt. 4–5.) IBM

argues that neither term requires construction, and that both terms should be given their plain and ordinary meaning.  (*See* IBM Br. 30–35.)  Carvana argues that a "portlet generator" should be defined as a "server application[] that dynamically generate[s] a portlet" and a "portal page generator" as a "a server application that dynamically generates a portal page comprised of portlets."  (Carvana Br. 35–38.)

In support of its position as to "portal page generator," IBM argues Carvana's "own construction uses the phrase 'generates a portal page,' which confirms that 'generates' and 'portal page' have well-understood meanings that require no construction."  (IBM Br. 33.)  Carvana argues that "portal page generator" should be construed consistently with Figure 6, which describes the portal page generator as "a server application that dynamically generates a portal page comprised of portlets."  (Carvana Br. 36 (citing '234 Patent col. 6 l. 45–46).)

The Court agrees with IBM's construction.  "Generator" and "page" are terms whose ordinary meaning are known to a jury, a conclusion that is bolstered by the fact that Carvana uses "generates" and "page" in its proposed construction.  (*See* Carvana Br. 35.)  Moreover, the specification does not suggest that IBM intended to act as its own "lexicographer" or "disclaim" the ordinary meaning of the terms.  (*See generally* '234 Patent.)  Carvana's reliance on Figure 6 does not disturb this conclusion, because the specification makes clear that this embodiment is exemplary, rather than intended to serve as a limiting definition.  (*See id*. col. 6 l. 63 (describing Figure 6 as an "example").)

For the foregoing reasons, the Court declines to construe the term "portal page generator" because the term is "readily understandable."  *Parking Tech. Holdings LLC v. Park Assist, LLC*, No. 20-CV-3156, 2024 WL 1885334, at *8 (S.D.N.Y. Apr. 30, 2024); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) (holding that where the disputed

phrase was "comprised of commonly used terms" that did not have any "special meaning in the art," "the district court did not err by declining to construe the claim term"); *Edge Sys. LLC v. Cartessa Aesthetics, LLC*, 571 F. Supp. 3d 13, 20 (E.D.N.Y. 2021) (noting that the "relative simplicity" of the terms "abrade" and "sharp" were readily understandable by a lay juror and therefore did not require construction).

The Court concludes that this same reasoning extends to the term "portlet generator." As discussed above, the term "generator" is readily understandable by lay persons—reasoning that is again underscored by the fact that Carvana relies on the term *generate* in its definition of "portlet generator." (*See* Carvana Br. 35.) And again, any reliance Carvana places on Figure 6 is misplaced, as Figure 6 is an exemplary embodiment. (*See* '234 Patent col. 6 l. 63 (describing Figure 6 as an "example").) Furthermore, claim 7 recites: "a plurality of portlet generators, wherein each portlet generator generates a portlet." ('234 Patent, claim 7.) The Court agrees with IBM that claim 7's use of "generates" and "portlet" in the phrase defining the term "portlet generator" suggests that IBM intended the term "generator" to carry its plain and ordinary meaning. (*See* IBM Br. 30–31.) For those reasons, the Court concludes that "generators" need not be construed, because it has an ordinary meaning that is readily understandable by lay jurors. *See Parking Tech. Holdings LLC*, 2024 WL 1885334, at *8 ("The Court concludes that construction of the first disputed term is not necessary, as the term [is] readily understandable to a person of ordinary skill in the art and, indeed, by a layman.); *Edge Sys. LLC*, 571 F. Supp. 3d at 20 (noting that the "relative simplicity" of the terms "abrade" and "sharp" were readily understandable by a lay juror and therefore did not require construction).

For the foregoing reasons, the Court concludes that "portal page generator" and "portlet generator" can be understood by a lay jury and thus do not require additional construction.

c. "Stack(s) of Portlets" and "Stack of Stacks"

| Term | Carvana's Proposed Construction | IBM's Proposed Construction |
|---|---|---|
| Stack(s) of Portlets | "arrangement(s) of portlets covering one another such that only the top portlet is fully visible" | no construction necessary/plain and ordinary meaning |
| Stack of Stacks | "arrangement of stacks covering one another such that only the top stack is fully visible" | no construction necessary/plain and ordinary meaning |

The Parties also dispute the meaning of "stack(s) of portlets" and "stack of stacks," in claim 7. (*See* Joint Stmt. 5.) IBM argues that no construction is necessary for these terms because a lay juror could understand their plain and ordinary meaning. (*See* IBM Br. 35.) Carvana argues that "stack(s) of portlets" refers to "arrangement(s) of portlets covering one another such that only the top portlet is fully visible" and "stack of stacks" refers to an "arrangement of stacks covering one another such that only the top stack is fully visible." (Carvana Br. 38.)

Carvana makes a number of arguments in support of its preferred construction. First, it argues that its construction aligns with the "key purposes" of the '234 Patent: "decluttering portal pages." (Carvana Br. 40 (quoting '234 Patent col. 1 l. 33–36 and col. 6 l. 9–14.)) Second, it argues that its construction is consistent with the sole representation of "stacked portlets" in the '234 Patent, Figure 5:

14



STACKED PORTLETS
504

(*See* Carvana Br. 41). Third, Carvana argues that its construction aligns with a key functionality described in the '234 Patent, that a "user may toggle *between* the individual portlets that comprise a specific stacked portlet." (*Id.* 42 (citing '234 Patent col. 6 l. 11–14).) Fourth, Carvana argues that its position is consistent with the prosecution history of the '234 Patent, where IBM distinguished its invention from U.S. Patent Application Publication No. 2005/0065913 ("*Lillie*"), by noting that that one of *Lillie*'s figures, Figure 5, taught "overlap" rather than "stacking" and distinguishing "overlap" from "stacking" by noting that "overlap typically allows for a portion of the object to be seen underneath the top object." (*Id.* (citing *id*., Ex. 11 ("*Lillie* IBM Response") 8 (Dkt. No. 122-13).)

IBM, on the other hand, argues that Carvana's construction is circular: "Carvana's construction of 'stack of portlets' requires that 'the top portlet is fully visible.' Carvana's construction of 'stack of stacks,' requires that 'only the top stack is fully visible,' meaning that none of the other stacks—and none of the portlets in those stacks—can be 'fully visible.' Carvana therefore creates a situation where 'stack of stacks' is arguably an impossibility, because only one set of portlets—the 'top stack'—can ever have a portlet that is 'fully visible' and satisfy Carvana's construction of 'stack(s) of portlets.'" (IBM Br. 36 (quoting '234 Patent,

15

Claim 7).)  Furthermore, IBM argues that Carvana's reliance on Figure 5 of the '234 Patent improperly "imports limitations from a preferred embodiment of the specification."  (*Id*. 37.)

The Court does not adopt either construction, and instead concludes that the appropriate construction of the term "stack(s) of portlets" in the '234 Patent is an "arrangement(s) of portlets covering one another such that at least some portlets are not visible."  Similarly, the Court construes a "stack of stacks" to refer to an "arrangement of stacks covering one another such that at least some stacks are not visible."  This construction accounts for IBM's objections regarding the circularity of Carvana's proposed construction.  Moreover, it also addresses Carvana's argument that IBM's objections elide the prosecution history, and in particular IBM's position during the prosecution of the '234 Patent that an object is "stacked" when at least some portion of the objects in the stack are not visible.  (*See Lillie* IBM Response 8 (arguing that *Lillie* does not render the '234 Patent obvious because it shows portlets "fully visible" and thus does not teach stacking).)  Furthermore, the Court's construction aligns with the disclosed purpose of the invention, which is to reduce clutter in portals.  *See Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023) ("We have explained that a patent's express purpose of the invention 'informs the proper construction of claim terms.'"); *Barrday, Inc. v. Lincoln Fabrics Inc.*, No. 15-CV-165, 2021 WL 3076869, at *5 (W.D.N.Y. July 21, 2021) (noting that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." (quoting *Profectus Tech. LLC v. Huawei Tech. Co., Ltd.*, 823 F.3d 1375, 1380–81 (Fed. Cir. 2016))).

For the reasons discussed above, the Court construes "stack(s) of portlets and "stack of stacks" to indicate an arrangement whereby at least some of the stacked objects are not visible. *See Dynamics Inc. v. Samsung Elecs. Co.*, No. 19-CV-6479, 2023 WL 5702503, at *4–5

16

(S.D.N.Y. Sept. 5, 2023) (rejecting both parties' proposed constructions and applying its own); *Shaf Int'l, Inc. v. First Mfg. Co. Inc.*, No. 20-CV-1242, 2022 WL 2791999, at *6 (E.D.N.Y. July 15, 2022) (modifying the plaintiff's proposed construction of a disputed term); *Fisher-Price, Inc. v. Kids II, Inc.*, No. 10-CV-988, 2015 WL 2401887, at *8 (W.D.N.Y. May 19, 2015) (adopting a construction proposed by neither the plaintiff nor the defendant).

   2.   The '346 Patent

      a.   "Federated Computing Environment"

| IBM's Proposed Construction | Carvana's Proposed Construction |
| --- | --- |
| "an environment having a loosely coupled affiliation of a plurality of distinct enterprises that adhere to certain standards of interoperability *and cooperate in a collective manner such that users can be granted access to resources at any of the federated enterprises as if they had a direct relationship with each enterprise*" | "an environment having a loosely coupled affiliation of a plurality of distinct enterprises that adhere to certain standards of interoperability; *the federation provides a mechanism for trust among those enterprises with respect to certain computational operations for the users within the federation*" |

   The Parties dispute the construction of the term "federated computing environment," which appears in claim 1. (*See* Joint Stmt. 7.) The Parties do not dispute that a "federated computing environment" refers to a "an environment having a loosely coupled affiliation of a plurality of distinct enterprises that adhere to certain standards of interoperability." (*See* IBM Br. 9; Carvana Br. 11.) However, Carvana argues that the term should be construed to require that the "distinct enterprises" "cooperate in a collective manner such that users can be granted access to resources at any of the federated enterprises as if they had a direct relationship with each enterprise." (Carvana Br. 10.) IBM argues instead that the term should be construed to provide that "the federation provides a mechanism for trust among those enterprises with respect to certain computational operations for the users within the federation." (IBM Br. 9.)

17

The '346 Patent states that a "federation is an environment having a loosely coupled affiliation of a plurality of distinct enterprises that adhere to certain standards of interoperability; the federation provides a mechanism for trust among those enterprises with respect to certain computational operations for the users within the federation." ('346 Patent, col.1 l. 64–col. 2 l. 1.) That is, the specification's definition of "federation" is precisely the definition IBM urges the Court to adopt for the term "federated computing environment." (IBM Br. 9.)

The Federal Circuit has referred to above-cited language from the specification as "on its face definitional," and noted that the claim term "federated computing environment" should be understood in light of this definition. *Int'l Bus. Mach. Corp. v. Iancu*, 759 F. App'x 1002, 1007 (Fed. Cir. 2019). At least one other court has interpreted the disputed term and credited the construction urged by IBM. *See Int'l Bus. Mach. Corp. v. Zillow Grp., Inc.*, No. 20-CV-851, 2022 WL 16532557, at *3–4 (W.D. Wash. Oct. 28, 2022) (adopting IBM's construction of "federated computing environment").

It is true that neither the Federal Circuit nor the other courts that have construed the term "federated computing environment" have conclusively determined whether the construction proposed by Carvana is appropriate. Nevertheless, the Court sees no justification for importing the limiting language proposed by Carvana. Although the specification does note that "[u]sers can be granted access to resources at any of the federated enterprises as if they had a direct relationship with each enterprise," ('346 Patent col. 10 l. 53–55), the use of permissive language like "can" does not convince the Court that this passage is meant to limit the scope of the invention as a whole, *see DNA Genotek Inc. v. Spectrum Sols. L.L.C.,* No. 21-CV-516, 2022 WL 17331255 (S.D. Cal. Nov. 29, 2022) (characterizing the word "can" as "permissive"), *aff'd sub nom. DNA Genotek Inc. v. Spectrum Sols. LLC*, No. 2023-2017, 2025 WL 502040 (Fed. Cir. Feb.

18

14, 2025); *Taction Tech., Inc. v. Apple Inc.*, No. 21-CV-812, 2022 WL 18781398, at \*19 (S.D. Cal. Sept. 28, 2022) (noting that the word "can" is "permissive language [that] is insufficient to represent a disclaimer of claim scope").

Furthermore, the Court finds no other intrinsic evidence clearly demonstrating that this claim term was intended to be so limited.  Therefore, because IBM's definition of "federated computing environment" aligns with the specification's explicit definition of the term "federation," as well as the definitions upheld by the Federal Circuit, the PTAB, and other district courts that have considered this issue, and because the Court cannot identify any reason in the intrinsic record to deviate from this definition, the Court adopts IBM's construction.

> b.  "Identifier Associated with User" and "User Attribute Information"

| Terms | Carvana's Proposed Construction | IBM's Proposed Construction |
|---|---|---|
| Identifier Associated with the User | "information that uniquely identifies the user, *distinct from user attribute information*" | "information that uniquely identifies the user" |
| User Attribute Information | "information about the user, *distinct from the identifier associated with the user*" | "information about the user" |

The Parties next dispute the terms "identifier associated with user" and "user attribute information," which appear in claim 1 and claims 5, 6, 8, 10, and 11, respectively.  (*See* Joint Stmt. 8–9.)  Both Parties agree that "identifier associated with the user" refers to "information that uniquely identifies the user."  (*See* Joint Stmt. 8.)  Similarly, both Parties agree that "user attribute information" refers to "information about the user."  (*See* Joint Stmt. 9.)  However, Carvana urges the Court to construe the term as limited to information that is "distinct from the identifier associated with the user."  (*Id.*; Carvana Br. 15–17.)  In support of this position, Carvana relies primarily on the prosecution history of the '346 Patent.  (*See* Carvana Br. 15–17.)

19

The doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 85 F.4th 1365, 1376 (Fed. Cir. 2023) (quoting *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)).  Prosecution disclaimer, which can arise from arguments made during prosecution or claim amendments, "only applies to unambiguous disavowals." *Malvern Panalytical Inc.*, 85 F.4th at 1376 (quoting *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012)).

In a prior IPR proceeding relating to the '346 Patent, *Ebates Performance Marketing, Inc. d/b/a Rakuten Rewards, et al. v. International Business Machines Corporation* (the "Rakuten IPR"), IBM argued that "dependent claim 5 [in the '346 Patent] recites 'user attribute information' separate from the claimed 'identifier.'"  (*See* Carvana Br., Ex 3 ("IBM *Ebates* Sur-Reply") 20 (Dkt. No. 122-4).)  IBM further stated that "a POSITA would have understood the claimed 'identifier' to be distinct from 'user attribute information.'"  (*Id*.)  These statements clearly disclaim any overlap between "identifier associated with the user" and "user attribute information."  (*Id*.)

Although the PTAB did not explicitly accept IBM's disclaimer, it also did not specifically reject it.  Instead, the PTAB held that because the opposing party "did not argue for a different construction in the Petition or Reply, and, even at the oral argument, did not offer a specific alternative to [IBM's proposed construction] or evidence in support of an alternative," that it would construe "identifier associated with the user" as "information that uniquely identifies the user."  (Carvana Br., Ex. 4 ("PTAB *Ebates* Decision") 15 (Dkt. No. 122-5).)

While it is true that some courts have "denied prosecution disclaimer [where the examiner expressly rejects the patentee's argument]," *Zoho Corp. v. Sentius Int'l, LLC*, No. 19-

CV-1, 2020 WL 3128910, at *11 (N.D. Cal. June 12, 2020) (collecting cases), "[t]he Federal Circuit has explained that '[a]n applicant's argument made during prosecution may lead to a disavowal of claim scope even if the Examiner did not rely on the argument,'" *Unicorn Energy GMBH v. Tesla Inc.*, No. 21-CV-7476, 2023 WL 322891, at *5 (N.D. Cal. Jan. 19, 2023) (citing *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1374 (Fed. Cir. 2005) and *Microsoft Corp. v. Multi–Tech Sys.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004)).  The Court concludes that rather than explicitly rejecting IBM's disclaimer, the PTAB simply did not rely on IBM's argument in its claim construction decision—apparently in large part because the opposing party did not pursue an argument for alternative construction of the disputed term.  Because the PTAB did not explicitly reject IBM's argument, the Court concludes that the doctrine of prosecution disclaimer applies and adopts Carvana's construction.  *See Unicorn Energy GMBH*, 2023 WL 322891, at *5 (concluding the doctrine of prosecution disclaimer applied where "the PTAB did not rely on [the plaintiff's] disclaimer, but it also did not reject it"); *see also Zoho Corp.*, 2020 WL 3128910, at *11–12 (noting that district court rulings denying prosecution disclaimer where the examiner rejected the patent-holders argument were in "some tension with Federal Circuit holdings" and holding that where the examiner "*explicitly* rejects a patentee's argument," the doctrine of prosecution disclaimer *may* not apply (emphasis added)).

c.   "Back-Channel Information Retrieval Mechanism"

| Carvana's Proposed Construction | IBM's Proposed Construction |
|---|---|
| "communication between two systems that relies on a direct connection without using redirects through an intermediary such as a browser" | "a retrieval mechanism that involves communication directly from a second system to a first system" |

The Parties dispute whether a "back-channel information retrieval mechanism," which appears in claims 8 and 9, can involve redirection through an intermediary browser.  (*See* Joint

Stmt. 10.)  Carvana argues that it cannot, urging the Court to construe the term to mean

"communication between two systems that relies on a direct connection without using redirects

through an intermediary such as a browser."   (Carvana Br. 18.)  IBM argues that it can, urging

the Court to construe the term to mean "a retrieval mechanism that involves communication

directly from a second system to a first system."  (IBM Br. 15.)  The Court adopts Carvana's

construction.

As noted above, Carvana and IBM primarily dispute whether a "back-channel

information retrieval system" can involve redirects through an intermediary, such as a web-

browser.  In support of its preferred construction, Carvana points to Figure 9E, which depicts a

"back-channel retrieval operation."  ('346 Patent col. 36 l. 36–7.)  Figure 9E depicts a direct

interaction between the service provider and the identity provider, without any HTTP-based

redirect:



COMPLETION OF PUSH-TYPE SSO OPERATION WITH RUNTIME USER ACCOUNT CREATION AT SP
(BACK-CHANNEL USER ATTRIBUTE RETRIEVAL BY SP FROM IDP)

*FIG. 9E*

(*See* '346 Patent Fig. 9E.)  By contrast, Figure 9D—which depicts a front-channel information retrieval operation—relies on the use of a HTTP-redirect message that is sent by the service provider to the client directly:



COMPLETION OF PUSH-TYPE SSO OPERATION WITH RUNTIME USER ACCOUNT CREATION AT SP
(FRONT-CHANNEL USER ATTRIBUTE RETRIEVAL BY SP FROM IDP)

*FIG. 9D*

(*See* '346 Patent Fig. 9D.)  Carvana's construction captures what appears to be the key distinction between the two figures: the front-channel information retrieval mechanism obtains additional user attribute information by using an HTTP redirect, while the back-channel mechanism does not.

This construction is further supported by other passages in the specification that distinguish between front-channel and back-channel mechanisms.  In referring to Figure 8, for example, the specification states that "the present invention is not limited to front-channel communications *as represented by* HTTP redirection-based techniques but may be equally applied to back-channel techniques, such as SOAP/HTTP or SOAP/MQ."  ('346 Patent col. 28 l. 62–66 (emphasis added).)  This passage implies that HTTP-redirection techniques are a type of front channel communication that is *distinct* from back-channel techniques, such as SOAP/HTTP

23

or SOAP/MQ.  This passage therefore supports Carvana's construction insofar as it suggests that browser-related redirection techniques are specific to front-channel communications.

IBM points out that Figures 9C–9E are referred to as "dataflow diagrams [that] depict an HTTP-redirection-based single-sign-on operation," which suggests that Figure 9E also depicts an HTTP-redirection-based single-sign on operation.  ('346 Patent col. 35 l. 9–10.)  IBM argues that if "back-channel information retrieval mechanism" is construed to exclude HTTP-redirection, the Court will effectively eliminate a preferred embodiment—namely, Figure 9E.  (IBM Br. 16.) While the point is well-taken, the Court concludes that a better reading of this passage, in light of the aforementioned portions of the specification, is that it describes 9C–9E as a "dataflow" with two distinct parts.  First, 9C is described as "an HTTP-redirection-based single-sign-on operation that is initiated by a federated identity provider to obtain access to a protected resource at a federated service provider," and second, Figures 9D and 9E are described as "alternative methods for obtaining user attributes by the federated service provider."  ('346 Patent col. 35 l. 9–15.)

The Court is mindful of its duty to "review disputed claim terms in light of the patent as a whole, in order to avoid inconsistent usage of claim terms."  *Ave. Innovations, Inc. v. E. Mishan & Sons Inc.*, No. 16-CV-3086, 2019 WL 4857468, at *5 (S.D.N.Y. Oct. 2, 2019), *aff'd*, 829 F. App'x 529 (Fed. Cir. 2020).  In light of this requirement, and the evidence in the specification as a whole, the Court concludes that Carvana's construction better captures the meaning of "back-channel information retrieval mechanism."

3.  <u>The '719 Patent</u>

a.  <u>"Application"</u>

| Carvana's Proposed Construction | IBM's Proposed Construction |
| --- | --- |

| "software that allows users to access and update data" | no construction necessary/plain and ordinary meaning |
|---|---|

The Parties also dispute the meaning of the term "application," which appears in claims 1, 3, 10–12, and 26. (*See* Joint Stmt. 12.) IBM argues that "application" is a term that does not require construction, and that it should carry its "plain and ordinary meaning" in the context of the '719 Patent, which IBM contends is "a software that performs a task." (IBM Br. 19.) Carvana argues that a more limited construction is justified by the intrinsic evidence; specifically, Carvana argues that the term should be construed to mean: "software that allows users to access and update data." (Carvana Br. 23.)

In support of this construction, Carvana primarily relies on the "Background of the Invention" section of the '719 Patent, which states that: "[t]ypical world wide web (e.g., Internet/Intranet) applications allow users to access and update data on remote servers." (*See* '719 Patent, col. 1 l. 16–17.) However, as IBM points out, the use of the word "typical" and the word "allow" suggest a permissiveness that does not align with Carvana's limiting construction. *See Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, No. 14-CV-6544, 2016 WL 6583637, at *4 (E.D.N.Y. Nov. 7, 2016) (concluding that no limiting construction was necessary where, inter alia, the patent used "qualifiers" such as "typically"); *Nassau Precision Casting Co. v. Acushnet Co.*, 940 F. Supp. 2d 76, 91 (E.D.N.Y. 2013) ("Moreover, the presence of words such as 'typically' or 'normally' in a detailed embodiment 'is not enough . . . to limit the patentee's clear, broader claims.'"), *aff'd in part, vacated on other grounds, remanded*, 566 F. App'x 933 (Fed. Cir. 2014).

Furthermore, the fact that the specification only discusses or illustrates "applications" that permit "access[ing] and updat[ing] data," (*see* Carvana Br. 24), does not require that the claims be so limited. Courts are loath to import limitations from the specification into the claims where

25

the inventor has not clearly expressed an intent to do so.  *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) ("[E]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." (internal quotation marks and citations omitted)); *Nanobebe US Inc. v. Mayborn (UK) Ltd.*, No. 21-CV-8444, 2023 WL 2986936, at *8 (S.D.N.Y. Apr. 18, 2023) ("While the embodiments do describe [the proposed limitation], the [c]ourt will not read limitations from embodiments, as a part of the specification, into claims.").

Because "application" is a term whose ordinary meaning is readily understood, and because Carvana fails to show that limitations are justified by the intrinsic evidence, the Court declines to construe this term.  *See Summit 6, LLC*, 802 F.3d at 1291 (holding that where the disputed phrase was "comprised of commonly used terms" that did not have any "special meaning in the art," "the district court did not err by declining to construe the claim term"); *Edge Sys. LLC*, 571 F. Supp. 3d at 20 (noting that the "relative simplicity" of the terms "abrade" and "sharp" were readily understandable by a lay juror and therefore did not require construction).

b.  "Model Associated with the Application"

| Carvana's Proposed Construction | IBM's Proposed Construction |
|---|---|
| "*application* data, rules, and algorithms affecting the application data" | "the data, rules, and algorithms affecting the data *associated with the application*" |

The Parties dispute the term "model associated with the application," which appears in claims 1 and 26.  (*See* Joint Stmt. 13.)  Both Parties agree that the term "model" refers to "data, rules, and algorithms affecting the application data."  (*See id*.)  However, Carvana urges the court to adopt a construction of the term that would limit the "model" to the "application's

model." (Carvana Br. 25–27 (urging the Court to construe the term "model associated with the application" to mean "*application* data, rules, and algorithms affecting the application data" (emphasis added)).) IBM argues this construction is unnecessarily limited, and that the term should be construed to mean "the data, rules, and algorithms affecting the data *associated with* the application." (IBM Br. 21–23 (emphasis added).)

The Federal Circuit has held that the term "associated with" has a plain meaning that is readily understood by jurors, and that it conveys a "required functional relationship" distinct from "of." *See ViaTech Techs. Inc. v. Microsoft Corp.*, 733 F. App'x 542, 549 (Fed. Cir. 2018). In order to conclude that this plain meaning should not control, the Court "looks to the specification to see if it clearly redefines or disavows the plain meaning of "associated with." *Int'l Bus. Mach. Corp. v. Zynga Inc.* (hereinafter "*Zynga*"), No. 22-CV-590, 2023 WL 7129859, at *8 (D. Del. Oct. 30, 2023).

In *Zynga*, another district court faced precisely the same dispute and adopted IBM's proposed construction of the term. *See id.* at *8–9. The *Zynga* court assessed the intrinsic evidence to determine whether IBM had specifically redefined or disavowed the plain meaning of "associated with," such that the other party's more limited construction was justified. *See id.* Ultimately, the court concluded that the intrinsic evidence did not justify a deviation from the plain meaning of the word "associated with." *See id.*

Here, Carvana argues that claim 26 supports a more limited construction of "associated with" than would be justified under a "plain meaning" approach, because it states that "a model . . . compris[es] 'application data, rules, and algorithms affecting the data.'" (Carvana Br. 25–26 (citing '719 Patent, col. 12 l. 25–26).) Carvana argues that this language makes clear that "the data being affected is the 'application data,'" and that IBM's construction—which would permit

27

data that is "associated with" rather than "of" the application—is impermissibly broad. (*See id.*) But claim 26 (and, in particular, the word "comprises") cannot bear the weight of Carvana's argument, because the Federal Circuit has clearly held that "comprises" is an "inclusive or open-ended term." *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1352 (Fed. Cir. 2017). Therefore, claim 26's reference to "application data" does not "exclude unrecited elements," namely, data "associated with," but not directly related to, the application. *See id.* (noting that "the use of ['comprising'] does not exclude unrecited elements."); *see also Wash World, Inc. v. Belanger, Inc.*, No. 19-CV-1562, 2021 WL 913529, at *6 (E.D. Wis. Mar. 10, 2021) ("[The defendant] is correct that the word 'comprising' is open-ended and means 'including.'"). This intrinsic evidence therefore does not suggest that IBM intended to limit the meaning of the term "model" in the manner suggested by Carvana. Nor does it suggest that the scope of the words "associated with" should be construed more narrowly in the '719 Patent than their plain meaning would suggest.

The Court therefore concurs with the *Zynga* court and concludes that a "model associated with the application" refers to "the data, rules, and algorithms affecting the data associated with the application." *See Zynga*, 2023 WL 7129859, *8–9.

c. "Controller Logic Associated with the Application"

| Carvana's Proposed Construction | IBM's Proposed Construction |
|---|---|
| "program code that processes user requests and causes the model to be changed *and* the view to be refreshed" | "program code that processes user requests *and/or* causes the model to be changed and the view to be refreshed" |

The Parties next dispute the meaning of the term "controller logic associated with the application," which appears in claims 1 and 26. (*See* Joint Stmt. 14.) Carvana argues that the term should be construed to mean "program code that processes user requests and causes the model to be changed *and* the view to be refreshed." (*Id.* (emphasis added).) IBM argues that the

28

term should be construed to mean "program code that processes user requests and causes the model to be changed *and/or* the view to be refreshed." (*Id*. (emphasis added).)

IBM argues that its construction is directly supported by the specification, which states that "[t]he Controller causes the model to be changed and/or the view to be refreshed." (IBM Br. 24 (citing '719 Patent col. 1 l. 45–47).) In response, Carvana argues that this construction is fundamentally incompatible with the '719 Patent's Model, View, Controller ("MVC") structure, because the MVC structure is premised on "organiz[ing] an application into three distinct components: Model, View, and Controller." (Carvana Br. 29.) According to Carvana, because the "view" logic "generates a screen or window representation . . . of the model the application chooses to display," a "controller logic" that causes the "view" to be "refreshed" would unduly usurp the role of "view logic," and therefore would be in violation of the MVC's tripartite, distinctive structure. (*Id*. at 28.)

The Court adopts IBM's construction. First, IBM's construction is directly supported by the specification. (*See* '719 Patent col. 1 l. 44–47 ("The Controller causes the Model to be changed and/or the View to be refreshed.").) Second, adhering to the specification's definition of "controller" does not necessarily undermine the MVC's tripartite structure. This construction requires only that "controller" logic involves program code that "*causes* . . . the View to be refreshed." (*Id*.) "Cause" is a verb that can denote both a direct and indirect relationship. *See cause (verb),* Merriam-Webster Dictionary, https://tinyurl.com/mrtjrwhf [https://perma.cc/W6W3-LURB] (last visited Oct. 1, 2025). IBM's construction is perfectly compatible with a scenario in which the controller "causes" a view to be refreshed, by indirectly causing another entity to "generate" a refreshed view. Therefore, the Court rejects Carvana's

29

argument that IBM's construction necessarily allows the controller to usurp the role of the view in the MVC structure.

Because IBM's definition of "controller logic" aligns with the specification's explicit definition of the term "controller," and because the Court cannot identify any justification in the intrinsic record to deviate from this definition, the Court adopts IBM's construction.

          d.  <u>"Frame(s)"</u>

| Carvana's Proposed Construction | IBM's Proposed Construction |
|---|---|
| "section(s) of a webpage, each constituting a distinct HTML document" | no construction necessary/plain and ordinary meaning |

The Parties dispute the construction of the term "frame(s)," which appears in claims 4, 8, and 10.  (*See* Joint Stmt. 15.)  IBM contends that no construction is necessary, and that the term should be given its plain and ordinary meaning.  (*See id*.)  Carvana argues that the term should be construed to mean "section(s) of a webpage, each constituting a distinct HTML document." (Carvana Br. 29.)

Carvana's argument relies primarily on language found in the Background of the Invention section, which states:

> It is to be appreciated that the term "frame" as used herein has a similar usage as in HTML. Web browsers typically display one or more windows on the client's screen. Each window may correspond to one HTML frame, or may instead correspond to one HTML "frameset." A frameset comprises one or more frames, which are like sub-windows inside a frameset window.

('719 Patent col. 3 l. 26–32.)  Carvana argues that this language demonstrates that a frame must be "distinct and capable of functioning independently as a separate HTML document."  (Carvana Br. 30.)  While this language certainly suggests that a "frame" may refer to an HTML document, the Court does not read the foregoing passage to *require* that a frame refer to HTML.  The passage states that "the term 'frame' as used herein has a *similar usage* as in HTML."  "Similar

usage" does not suggest that the term frame has the *same* meaning as "frame" in HTML, nor that HTML is required, because the word "similar" suggests that HTML is being used as an exemplary reference, rather than a strict limitation. Nor does the subsequent phrase—"[e]ach window may correspond to one HTML frame"—require Carvana's limiting construction, because the word "may" is permissive and therefore also suggests that HTML is being used as an example. *See Impinj, Inc. v. NXP USA, Inc.*, No. 19-CV-3161, 2022 WL 2125134, at *6 (N.D. Cal. Mar. 21, 2022) (noting that the use of the "permissive verb 'may' . . . indicates [a] capability and not a requirement"); *Capstan AG Sys., Inc. v. Raven Indus., Inc.*, No. 16-CV-4132, 2018 WL 953112, at *13 (D. Kan. Feb. 20, 2018) ("'[M]ay' [is] commonly used by patentees to show that a limitation is permissive.").

Carvana's argument as to why each frame must be a "distinct" document relies on a structural rationale. (*See* Carvana Br. 30.) Carvana points to the Summary of Invention section, which states that "invisible" frames rewrite "visible" frames because "a client-side application attempting to update its view will destroy itself by overwriting its own Controller logic and Model data." (Carvana Br. 30 (citing '719 Patent col. 3 l. 33-50).) While the Court agrees that this passage suggests that visible and invisible frames must be distinct from one another, it does not follow that *all* frames need be distinct documents. Given that there is no other intrinsic evidence suggesting that frames were intended to be construed as distinct documents, the Court declines to impose such a limitation. *Mirror Worlds Techs., LLC v. Facebook, Inc.*, 588 F. Supp. 3d 526, 541 (S.D.N.Y. 2022) (rejecting a limiting construction where, inter alia, "it [found] no support in the claim language or the specification"), *aff'd in part, appeal dismissed in part sub nom. Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860 (Fed. Cir. 2024); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, No. 13-CV-538, 2015 WL 903018, at

31

*13 (N.D.N.Y. Mar. 3, 2015) (rejecting a proposed construction where it imposed a limitation that "[found] no support from the intrinsic evidence").

The Court agrees, however, that "frame" is capable of myriad interpretations, and that "IBM's presentation of a dictionary with 36 definitions [] dramatically undermines IBM's assertion that 'frame[s]' has a single, plain and ordinary meaning." (*See* Carvana Br. 18.) Therefore, the Court elects to construe the term to mean "section(s) of a screen area associated with the browser software." This construction best aligns with the language in claim 4, which states that a frame is obtained when a "screen area associated with the browser software" is "partion[ed]." (*See* '719 Patent Claim 4.) *See Nike, Inc. v. Lululemon USA Inc.*, No. 23-CV-771, 2023 WL 9003708, at *1 (S.D.N.Y. Dec. 28, 2023) ("Claim language is always the most important reference for interpreting terms."); *Rates Tech. Inc. v. Broadvox Holding Co., LLC*, 15 F. Supp. 3d 307, 325 n.106 (S.D.N.Y. 2014) ("[T]he most important indicator of the meaning of [a disputed claim term] is its usage and context in the claim itself." (quoting *Middleton, Inc. v. Minnesota Mining and Manufacturing, Co*., 311 F.3d 1384, 1387 (Fed. Cir. 2002)).

III.    Conclusion

Accordingly, the Court adopts the constructions set forth above.  The stay ordered on September 3, 2025 is lifted.  The Court will hold a telephonic status conference on February 17, 2026 at 3:30 PM.

SO ORDERED.

Dated:    January 27, 2026
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

33